SLR/vl:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

               Plaintiff,

      - against -

ALL FUNDS ON DEPOSIT IN, OR TRANSFERRED
TO CREDIT SUISSE ACCOUNT #326324-3 AND
ALL SUB-ACCOUNTS THEREOF, HELD IN THE
NAME OF INGRID ANNA-CHRISTINA RAZMILOVIC,
AND ALL PROCEEDS TRACEABLE THERETO,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JAN 17 2014   ★

LONG ISLAND OFFICE

**VERIFIED COMPLAINT
IN REM**

Civil Action

**CV - 14 0367**

**BIANCO, J.**

      Plaintiff UNITED STATES OF AMERICA, by its attorney LORETTA E.

LYNCH, United States Attorney for the Eastern District of New York, VINCENT LIPARI,

Assistant United States Attorney, of counsel, alleges upon information and belief:

### PRELIMINARY STATEMENT

      1.    This is a civil action in rem to enforce the provisions of Title 18, Section

981(a)(1)(C) and (a)(1)(H) of the United States Code, for forfeiture of the above-captioned

property, and all proceeds traceable thereto (collectively, the "Defendant Properties").

### JURISDICTION

      2.    This Court has jurisdiction over this action pursuant to Title 28, Sections

1345 and 1355 of the United States Code, 28 U.S.C. §§ 1345, 1355.

### DEFENDANTS-IN-REM

      3.    The Defendant Properties consist of all funds on deposit in, or transferred to

Credit Suisse Account #326324-3 and all sub-accounts thereof, held in the name of Ingrid Anna-Christina Razmilovic and all proceeds traceable thereto in an amount in excess of $12,000,000.

## STATUTORY BACKGROUND

4.     The Defendant Properties are subject to forfeiture pursuant to: (a) 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a violation of any offense constituting a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7); to wit (i) securities fraud, 15 U.S.C. §§ 78j(b) and 78ff; (ii) mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, (iii) or a conspiracy to commit mail, wire, or securities fraud; and (b) 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering and unlawful monetary transactions, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (a)(2)(B)(1).

## FACTS

**I.    Background**

**A.    The Company**

5.     Symbol Technologies, Inc. ("Symbol"), a Delaware corporation headquartered and with its principal place of business located in Holtsville, New York, was one of the world's leading manufacturers and distributors of wireless and mobile computing and bar code reading devices as well as other networking systems.

6.     Symbol's reported revenues for the calendar years 2000, 2001 and 2002 were approximately $1.45 billion, $1.453 billion and $1.32 billion, respectively.

7.     As a result of fraudulent practices at Symbol, some of which are described more fully below, from 1998 to the third quarter of 2002 (the "Relevant Period") Symbol overstated net revenue by a total of $234.2 million and net earnings by a total of $324.7 million.

8.     Symbol sold its products and services directly to end-users, as well as to distributors and value-added resellers ("VARs") that resold Symbol's products to end-users. These distributors and VARs were sometimes referred to as "channel partners" because they provided a channel through which Symbol's products were distributed from Symbol to end-users. In 2000 and 2001, Symbol's sales to channel partners accounted for more than 60 percent of Symbol's total sales.

9.     Symbol was a publicly traded corporation, the common stock of which was traded on the New York Stock Exchange under the trading symbol "SBL." Symbol's shareholders were located throughout the United States, including in the Eastern District of New York.

**B.     Symbol's Executives**

10.     Tomo Razmilovic was employed by Symbol beginning in 1989.   In 1995, he became Symbol's President and Chief Operating Officer.   On July 1, 2000, Razmilovic became Symbol's President and Chief Executive Officer.   He left Symbol in February 2002.

11.     Kenneth Jaeggi was employed by Symbol as the Senior Vice President of Finance and Chief Financial Officer from May 1997 to December 2002.

12.     Brian Burke was employed by Symbol beginning in 1987.   Burke held various positions at Symbol, including Senior Vice President and Corporate Controller, Chief Accounting Officer, Senior Vice President of Worldwide Operations and Senior Vice President of Corporate Development.   Burke left Symbol in May 2002.

13.     Michael DeGennaro was employed by Symbol as Senior Vice President of Finance from October 2000 to September 2002.

14.     Frank Borghese was employed by Symbol beginning in 1988.   Borghese held various positions at Symbol including Senior Vice President and General Manager of

Worldwide Sales and Services. Borghese left Symbol in December 2001.

15. Christopher DeSantis was employed by Symbol beginning in 1995 and held various positions at Symbol, including Director of Operations Finance and Vice President of Finance. DeSantis left Symbol in December 2001.

16. James Heuschneider was employed by Symbol beginning in 1993 and held various positions at Symbol, including Director of Finance. He left Symbol in January 2003.

17. Leonard Goldner joined Symbol in 1990 as the company's Senior Vice President and General Counsel. Goldner became an Executive Vice President of Symbol in 2001. Goldner left Symbol in June 2003.

18. Robert Korkuc held various positions at Symbol, including Director of Corporate Accounting and Chief Accounting Officer. Korkuc left Symbol in March 2003.

19. Robert Asti held various positions at Symbol, including Vice President of Finance and Operations for the Americas -Sales and Services ("TASS") and Vice President of Worldwide Sales and Finance. Asti left Symbol in March 2001.

20. Robert Donlon joined Symbol in 1989. Donlon held various positions at Symbol, including Director of Sales Operations. Donlon left Symbol in April 2003.

21. James Dean held various finance-related positions at Symbol, including Director of Finance. Dean left Symbol in June 2003.

22. Gregory Mortenson held various positions at Symbol, including Financial Manager for TASS, Director of Finance for TASS and Senior Director of Finance. Mortenson left Symbol in March 2003.

C. **Certain Relevant Accounting Principles**

23. As a public company, Symbol was required to comply with the rules and

regulations of the United States Securities and Exchange Commission (the "SEC"). The SEC's rules and regulations are designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the investing public.

24. Under the SEC's rules and regulations, Symbol and its officers were required to (a) make and keep books, records and accounts which, in reasonable detail, fairly and accurately reflected the company's business transactions, including the company's revenues and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) that included financial statements that accurately presented Symbol's financial condition and the results of its business operations in accordance with GAAP.

25. In Symbol's annual report on Form 10-K for the year 2000, Symbol's accounting policy concerning its revenue recognition practices was set forth as follows:

> Revenue related to sales of the Company's products and systems is generally recognized when products are shipped or services are rendered, the risk of loss has passed to the customer, the sales price is fixed or determinable, and collectibility is reasonably assured.

This policy, as stated, was consistent with the GAAP rules for revenue recognition.

### D.     The Consensus Estimate and the Culture at Symbol

26. For each financial reporting period, professional stock analysts estimated what they believed would be Symbol's revenue during the period and predicted the earnings per share of Symbol's stock. The average of the estimates of the professional analysts was commonly

referred to as the "Consensus Estimate."

27. The Consensus Estimate predicted Symbol's revenues and earnings, but did not consider or include the impact of non-recurring one-time charges such as restructuring expenses and relocation costs. Non-recurring expenses, because they were one-time charges not characteristic of ordinary business expenses, were routinely discounted by the investing public in assessing a company's overall financial performance.

28. Symbol's quarterly financial statements reported revenues and earnings, excluding non-recurring charges, met or exceeded the Consensus Estimate for 32 consecutive quarters from the mid-1990s through the first quarter of 2001. Moreover, after missing the Consensus Estimate for the second quarter of 2001, Symbol's quarterly financial statements for the third and fourth quarter of 2001 reported revenues and earnings, excluding non-recurring charges, that again met or exceeded the Consensus Estimate for those quarters.

29. In order to maintain Symbol's record of meeting or exceeding the Consensus Estimate, Tomo Razmilovic established ambitious, and often unrealistic, financial performance targets for every Symbol division, and aggressively enforced those targets, rewarding those who met their targets and punishing those who failed to meet them.

30. It was the responsibility of the Symbol executives below Razmilovic, including Kenneth Jaeggi, Brian Burke, Michael DeGennaro, Frank Borghese, Christopher DeSantis, Leonard Goldner and James Heuschneider, to ensure that the divisions for which they had responsibility met these targets. Many executives' salaries and bonuses were tied to achieving these targets.

## II.   The Securities Fraud Scheme

31. Tomo Razmilovic, Kenneth Jaeggi, Brian Burke, Michael DeGennaro,

Frank Borghese, Christopher DeSantis and James Heuschneider, together with Leonard Goldner, Robert Korkuc, Robert Asti, Robert Donlon, James Dean, Gregory Mortenson and others, devised and carried out a scheme to defraud the investing public by materially misrepresenting Symbol's quarterly and annual revenues, expenses and earnings reported on Form 10-Qs and Form 10-Ks, which overstated Symbol's revenues and earnings, and understated Symbol's expenses.

32.     In furtherance of their scheme to commit fraud in connection with the purchase and sales of securities issued by Symbol, in violation of 15 U.S.C. §§ 78(j)(b) and 78(ff), 17 C.F.R. § 240.10b-5; to make and cause to be made false and misleading statements of material fact in applications, reports and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Section 78ff; to falsify Symbol's books, records, and accounts, the making and keeping of which was required by Title 15, United States Code, Section 78m(b)(2)(A) and 17 C.F.R. § 240.13b2-1, in violation of Title 15, United States Code, Sections 78m(b) (5) and 78ff; and to circumvent Symbol's internal accounting controls as required by Title 15, United States Code, Section 78m(b) (2) (B), in violation of Title 15, United States Code, Sections 78m(b) (5) and 78ff, Razmilovic, Jaeggi, Burke, DeGennaro, Borghese, DeSantis and Heuschneider, together with Korkuc, Asti, Donlon, Dean, Mortenson and others caused the filing of the following documents to be made with the SEC:

a.     On or about February 29, 2000, Razmilovic, Jaeggi and Burke signed Symbol's Annual Report on Form 10-K for the fiscal year that ended on December 31, 1999, and that document was submitted for filing to the SEC on or about March 1, 2000.

b.     On or about April 27, 2000, Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on March 31, 2000, and that document was submitted

for filing to the SEC on or about May 2, 2000.

c.     On or about July 31, 2000, Razmilovic and Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on June 30, 2000, and that document was submitted for filing to the SEC on or about August 2, 2000.

d.     On or about October 26, 2000, Razmilovic and Jaeggi signed Symbol's Quarterly quarter that ended on September 30, 2000, and that document was submitted for filing to the SEC on or about October 31, 2000.

e.     On or about March 29, 2001, Jaeggi and Korkuc signed Symbol's Annual Report on Form 10-K for the fiscal year that ended on December 31, 2000, and that document was submitted for filing to the SEC on or about March 30, 2001.

f.     On or about May 3, 2001, Razmilovic and Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on March 31, 2001, and that document was submitted for filing to the SEC on or about May 11, 2001.

g.     On or about August 13, 2001, Razmilovic and Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on June 30, 2001, and that document was submitted for filing to the SEC on or about August 14, 2001.

h.     On or about October 31, 2001, Razmilovic and Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on September 30, 2001, and that document was submitted for filing to the SEC on or about November 2, 2001.

i.     On or about March 22, 2002, Jaeggi and Korkuc signed Symbol's Annual Report on Form 10-K for the fiscal year that ended on December 31, 2001, and that document was submitted for filing to the SEC on or about March 26, 2002.

j.     On or about May 13, 2002, Jaeggi signed Symbol's Quarterly Report on

Form 10-Q for the fiscal quarter that ended on March 31, 2002, and that document was submitted for filing to the SEC on or about May 13, 2002.

        k.      On or about August 13, 2002, Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on June 30, 2002, and that document was submitted for filing to the SEC on or about August 13, 2002.

        l.      On or about November 14, 2002, Jaeggi signed Symbol's Quarterly Report on Form 10-Q for the fiscal quarter that ended on September 30, 2002 and, on the same date, further signed a certification stating, among other things: "The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls."

        33.      As set forth in greater detail herein, the scheme involved the following components: (a) the generation of bogus and prematurely recognized revenue; (b) the manipulation of Symbol's corporate books and records through top-side corporate journal entries; (c) the fabrication and utilization of improper restructuring expenses and "cookie jar" reserves; and (d) the creation of fraudulent accounting entries in the Customer Service accounts of Symbol's corporate books and records and the improper recognition of revenue in Customer Service accounts. The central goal of the scheme was to ensure that Symbol consistently reported that its revenues and earnings had met or exceeded the Consensus Estimate when, in truth, Symbol had not met the Consensus Estimate.

    A.     **Financial Manipulations**

        34.      By virtue of their positions at Symbol, Razmilovic and others had the power

and authority to affect and control Symbol's business and business transactions, financial statements and the contents of Symbol's public statements to the marketplace, including the SEC filings and press releases discussed below.

35.   By reason of his senior position at Symbol, Razmilovic had access to internal company documents, reports and other information, including adverse non-public material information about its business, financial condition and future prospects, and attended management and board of directors' meetings.   As a result, he had responsibility for the truthfulness and accuracy of Symbol's public reports, financial statements, and internal business records, a duty he intentionally and repeatedly breached.

**B.   Channel Stuffing**

36.   Razmilovic, Jaeggi, Borghese and DeSantis, together with others, caused Symbol to overstate its quarterly revenue and earnings through systematic "channel stuffing" transactions entered into at or near the end of each fiscal quarter.   Through these channel stuffing transactions, Symbol purported to sell products to certain VARs and distributors even though the VARs and distributors had no firm obligation to pay for the products they purportedly purchased. Symbol then recognized as revenue amounts associated with these transactions, in contravention of GAAP and Symbol's own stated revenue recognition policy.

37.   As part of its channel stuffing, Symbol granted to certain distributors and VARs: (a) the right not to pay for products it purported to purchase unless and until the distributor or VAR resold the products ("Contingent Payment Terms"), and/or (b) the unconditional and guaranteed right to return the products without paying for them ("Return Rights").   Although the specific Contingent Payment Terms and Return Rights varied from transaction to transaction, in each case they effectively nullified the purported buyer's obligation to pay for the products.

38.     Symbol regularly entered into channel stuffing transactions at or near the end of each fiscal quarter from in or about and between 2000 and 2001.   These channel partners were referred to as "Friends of Frank" because they were VARs and distributors with whom Borghese had developed a special relationship that enabled Borghese and his co-conspirators to use these VARs and distributors for channel stuffing transactions.

39.     Among the many channel stuffing transactions in which Symbol falsely and fraudulently recognized revenue were, by way of example, the following:

a.     At the end of the first, second and third fiscal quarters of 2000, and at the end of the first fiscal quarter of 2001, Symbol solicited and entered into channel stuffing transactions with a distributor located in South America ("Distributor #1"), in which Distributor #1 placed multi-million dollar orders for products that Symbol had in its inventory, even though Distributor #1 had no need for the products.   Indeed, Symbol personnel instructed Distributor #1 as to which products Distributor #1 was to order.   Moreover, instead of shipping the products to Distributor #1 in South America, Symbol merely stored the products in warehouses in New York (the "Warehoused Products").   Symbol and Distributor #1 agreed that Distributor #1 (i) had no obligation to pay for the Warehoused Products, and (ii) could "exchange" the Warehoused Products at no cost when it placed new orders for products it actually needed.   Despite these terms, which were hidden from Symbol's outside auditors, Symbol fraudulently recognized and reported over $16 million in revenue from these transactions which were represented to be legitimate purchases of Symbol products by Distributor #1.

b.     At the end of the second and third fiscal quarters of 2000 and the first and second fiscal quarters of 2001, Symbol solicited and entered into multi-million dollar channel

stuffing transactions with a VAR ("VAR #1").   In these transactions, Symbol agreed that VAR #1 would not be required to pay for any Symbol products it could not resell and that VAR #1 could return any products it was unable to resell.   Despite these terms, which were hidden from Symbol's outside auditors, Symbol fraudulently recognized and reported more than $20 million in revenue from these transactions, which were represented to be legitimate and final purchases of Symbol products by VAR #1.

c.     At the end of the third fiscal quarter of 2000, Symbol solicited and entered into an approximately $5 million channel stuffing transaction with a VAR ("VAR #2").   In this transaction, Symbol agreed that VAR #2 could return any products it was unable to resell at no cost to VAR #2 and that VAR #2 would receive an additional payment of one percent of the value of whatever products it returned.   In fact, Symbol never even shipped the products to VAR #2, and, consequently, VAR #2 never returned any products purportedly purchased in this transaction to Symbol.   Nonetheless, in December 2000, Symbol gave VAR #2 a $50,000 rebate, reflecting the one percent payment for the channel stuffing transaction.   Despite these terms, which were hidden from Symbol's outside auditors, Symbol fraudulently recognized and reported the revenue purportedly earned in this transaction in the third fiscal quarter of 2000.

d.     At the end of the first fiscal quarter of 2001, Symbol solicited and entered into an approximately $3.7 million channel stuffing transaction with a VAR ("VAR #3").   In this transaction, Symbol agreed that VAR #3 would not be required to pay for the products it purported to purchase until after VAR #3 was able to resell them and that VAR #3 could return any products it was unable to resell. Symbol entered into this agreement even though the amount of the purchase order exceeded VAR #3's annual revenue and VAR #3 did not have a customer to purchase the Symbol products.   Despite these terms, which were hidden from Symbol's outside auditors,

Symbol fraudulently recognized and reported revenue from this transaction, which was represented to be a legitimate purchase of Symbol products by VAR #3, in the first fiscal quarter of 2001.

e.      At the end of the second fiscal quarter of 2001, Symbol solicited and entered into an approximately $3.6 million channel stuffing transaction with a VAR ("VAR #4"). In this transaction, Symbol agreed that VAR #4 would not be required to pay for the products it purported to purchase until after VAR #4 was able to resell the products and that VAR #4 could return any products it was unable to resell. Symbol also credited VAR #4's account by approximately $17,000 to cover VAR #4's increased insurance premiums for the Symbol products that VAR #4 would have to store.  Despite these terms, which were not disclosed to Symbol's outside auditors, Symbol fraudulently recognized and reported revenue from this transaction, which was represented to be a legitimate purchase of Symbol products by VAR #4, in the second fiscal quarter of 2001.

40.      Razmilovic, and other Symbol executives, were well aware of the channel stuffing transactions and went to great lengths to conceal them.  Because the channel partners were not obligated to pay, and therefore did not pay, for the large volume of products that Symbol purported to sell them in channel stuffing transactions, Symbol's accounts receivable balance grew in both amount and age-past-due.  Consequently, Symbol's Days-Sales-Outstanding figure ("DSO"), a calculation based upon the size and age of a company's accounts receivable balance, grew dramatically during 2000 and early 2001.

41.      Symbol's DSO was consistently examined and reported about by stock analysts, and its continued growth, which would have exposed Symbol's channel stuffing scheme to the investing public, was a matter of great concern for Symbol executives, including

Razmilovic.

42.     To reduce the DSO artificially, so as to conceal the channel stuffing scheme from the investing public, in or about the second fiscal quarter of 2001, Razmilovic, acting alone and with others, participated in establishing and implementing a scheme by which channel partners were asked to sign promissory notes promising to pay Symbol the amount purportedly due on their respective accounts.  This enabled Symbol to reclassify the accounts receivables attributable to channel stuffing transactions as debt.  These notes did not, however, alter any of the fundamental terms of the deals themselves, but simply extended the time to pay.

43.     By reclassifying accounts receivable as debt, Razmilovic and others were able to reduce Symbol's DSO by more than 25 percent, from 119 days at the end of the second quarter of 2001 to 89 days at the end of the third quarter of 2001.  This misleading reclassification of accounts receivable as debt was not disclosed to the investing public.

### C.     **Candy Deals**

44.     Another fraudulent technique used to overstate Symbol's quarterly revenues and earnings involved transactions that were commonly referred to as "Candy Deals." In these Candy Deals, Symbol persuaded VARs to purchase Symbol products from a distributor ("Distributor #2") even though the VARs did not have customers for the products. To induce the VARs to make such orders, Symbol promised: (a) to repurchase the products from the VARs at the price the VARs paid to Distributor #2, and (b) to pay the VARs an additional one percent of the purchase price.

45.     In these Candy Deals, Symbol did not sell the products directly to a VAR. Rather, Symbol sold products to Distributor #2, which then either resold the products to the VAR or used the products to restock its supply of Symbol products and then sold other Symbol products

from its inventory to the VAR.

46.     Razmilovic, Jaeggi, Burke and Borghese, together with others, caused Symbol to recognize more than $10 million in revenues in connection with Candy Deals in the first two fiscal quarters of 2000, notwithstanding the fact that they knew that the transactions generated no net income for Symbol. On the contrary, the defendants knew that the Candy Deals resulted in a net loss to Symbol because: (a) the prices the VARs paid to Distributor #2 for the products were higher than the prices Distributor #2 had paid Symbol for the products, which meant that Symbol had to repurchase the products at a price greater than the price at which it had sold the products, and (b) Symbol paid the VARs an additional one percent bonus to participate in the Candy Deals.

47.     The Candy Deals in which Symbol falsely and fraudulently recognized revenue included the following:

a.     At the end of the first fiscal quarter of 2000, Symbol induced a VAR ("VAR #5") to purchase $1,949,700.10 of Symbol products from Distributor #2. Symbol agreed that it would re-purchase the products from VAR #5 at the same price VAR #5 paid Distributor #2, and would pay VAR #5 an additional one percent bonus. Symbol then induced Distributor #2 to place a corresponding order with Symbol, the revenue from which was recognized during the first fiscal quarter of 2000.

b.     Also at the end of the first quarter of 2000, Symbol induced a VAR ("VAR #6") to purchase $1,874,276.20 of Symbol products from Distributor #2. Symbol agreed that it would re-purchase the products from VAR #6 at the same price VAR #6 paid Distributor #2, and would pay VAR #6 an additional one percent bonus. Symbol then induced Distributor #2 to place a corresponding order with Symbol, the revenue from which was recognized during the first fiscal quarter of 2000.

**D. Recognizing Revenue on the Intentional Shipment of the Wrong Product**

48. Another fraudulent technique used to overstate Symbol's quarterly revenue and earnings involved the deliberate shipment to a customer of the wrong Symbol products at or near the end of quarters when the Symbol products that the customer actually wanted were unavailable. Later, when the products that the customer actually wanted became available, Symbol either canceled the prior shipment or accepted the return of the wrong products, and then shipped the correct products to the customer. In this way, Symbol prematurely recognized revenue for legitimate orders.

49. For example, in June 2000, Symbol entered into a sham transaction with an end-user ("End-user #1") and a VAR ("VAR #7") involving approximately $3.8 million of Symbol products that End-user #1 wanted but which would not be available for shipment until after the end of the fiscal quarter. For the purpose of fraudulently and prematurely recognizing revenue from the sale of these products to End-user #1 in the second fiscal quarter of 2000, Symbol induced VAR #7 to act as an intermediary in the transaction and to place an order in June 2000 for $3.8 million of available Symbol products that neither VAR #7 nor End-user #1 wanted. Symbol agreed that VAR#7's bogus order would be canceled and replaced in the following quarter by a genuine order for the products that End-user #1 actually wanted, once the desired products became available.

**E. Recognizing Revenue On Products That Were Not Shipped by the End of a Quarter**

50. Another fraudulent technique used to overstate Symbol's quarterly revenues and earnings involved sales of Symbol products that were ordered by customers within a fiscal quarter but were not actually shipped to the customers within that quarter. Under GAAP and

Symbol's own stated revenue recognition policy, revenue resulting from such transactions should not have been recognized until the products actually were shipped. However, despite Symbol's failure to ship the products by the end of the quarter, Razmilovic, Jaeggi, Burke, DeGennaro, Borghese and DeSantis, together with others, improperly caused Symbol to recognize revenue on the products in that quarter.

51.     Moreover, in an effort to disguise Symbol's contravention of GAAP and its own stated revenue recognition policy, Razmilovic, Jaeggi, Burke, DeGennaro, Borghese and DeSantis, together with others, caused Symbol to obtain phony "ship-in-place" letters (also known as "bill-and-hold" letters) from its customers.   These bogus letters stated, in substance, that the customer wanted Symbol to hold the products at Symbol facilities rather than ship the products to the customer, and were relied on as justification for recognizing revenue notwithstanding the failure to ship the product.

52.     In reality, these letters were obtained after-the-fact and were back-dated to create the appearance that the customer had requested that Symbol hold the products in question, when, in fact, the customer had made no such request. In some instances, these "ship-in-place" letters were obtained months after the Symbol customer had received and paid for the Symbol product.

53.     The phony "ship-in place" transactions included the following:

a.      At the end of the first fiscal quarter of 2001,  Symbol recognized and reported revenue on an approximately $859,615 in connection with a sale of Symbol products to a VAR ("VAR #8") in which the products were not shipped to VAR #8 until after the end of the quarter. Despite the fact that VAR #8 had never requested that Symbol hold the products rather than ship them, Symbol obtained a phony "ship-in-place" letter from VAR #8 in or about June

2001, which was backdated to March 30, 2001.

   b.   At the end of the first fiscal quarter of 2001, Symbol recognized and reported revenue of $1,107,877 in connection with the sale of Symbol products to Distributor #2 in which the products were not shipped to Distributor #2 until after the end of the quarter. Despite the fact that Distributor #2 had never requested that Symbol hold the products rather than ship them, Symbol obtained a phony "ship-in-place" letter from Distributor #2 in or about June 2001, which was backdated to March 29, 2001.

   c.   At the end of the first fiscal quarter of 2001, Symbol recognized and reported revenue of approximately $407,369 in connection with the sale of Symbol products to VAR #3 in which the products were not shipped to VAR #3 until after the end of the quarter. Despite the fact that VAR #3 had never requested that Symbol hold the products rather than ship them, Symbol obtained a phony "ship-in-place" letter from VAR #3 in or about the third fiscal quarter of 2001, which was backdated to March 29, 2001.

   **F.   Improper Tango Adjustments**

   54.   Razmilovic, Jaeggi, Burke and DeGennaro, together with others, also caused Symbol to overstate its quarterly revenues and earnings and understate its expenses through bogus accounting journal entries. This technique was known to them as the "Tango" process.  As set forth in greater detail below, in the Tango process, Symbol's raw quarterly financial results, including expenses, revenues and earnings, were manipulated and fraudulently adjusted by bogus accounting journal entries in order to create the false appearance that Symbol had met the Consensus Estimate.

   55.   As part of the quarterly closing process at Symbol, the company's raw results from each of its divisions were collected and consolidated. Then, in the Tango process, the

consolidated raw numbers were compared to quarterly forecasts that Symbol's management had provided to the company's Board of Directors (the "Board forecasts").   Because Razmilovic and other participants in the Tango process closely monitored the predictions of the professional stock analysts who followed Symbol, the Board forecasts were typically consistent with the Consensus Estimate.

56.     The Tango process was summarized in what were known to Razmilovic and others as "Tango sheets." The Tango sheets listed the raw results and Board forecasts, as well as various proposed accounting journal adjustments, known as "Tango adjustments," which were designed to adjust Symbol's raw results to meet or exceed the Board forecasts.   Symbol reported the fraudulently adjusted results to the public in its Form 10-Qs and Form 10-Ks.

57.     Burke devised the Tango process in the mid-1990s and coined the phrase "Tango" to describe the dance done at Symbol to meet the projected revenue and earnings targets. From at least 1997 through the second fiscal quarter of 2002, improper Tango adjustments were made and approved by Razmilovic, Jaeggi, Burke and DeGennaro, together with others, as part of the overall scheme to overstate Symbol's revenue and earnings, and without regard to whether the adjustments accurately reflected Symbol's financial condition or were made in compliance with GAAP or Symbol's accounting policies.   The nature, size and timing of the Tango adjustments depended on the variation between Symbol's raw results and the Board forecasts, as well as on the opportunities for fraudulent manipulation that the defendants and their co-conspirators were able to identify. The fraudulent Tango adjustments included the following:

a.     **The Credit Memo Reserve**

58.     Symbol maintained a credit memo reserve account in its accounting journals. The credit memo reserve account was designed to account for potential future reductions

in recognized revenue resulting from customers' return of Symbol products. Accordingly, increases to this reserve decreased Symbol's reported revenue by a corresponding amount. As part of the Tango process, Symbol's credit memo reserve account was fraudulently manipulated in order to meet the Board forecasts and the Consensus Estimate.

59.    For example, as part of the Tango process for the first fiscal quarter of 2000, Korkuc determined that the credit memo reserve account should properly have been increased by $13.7 million.    However, in order to achieve reported revenues totaling $320 million for the first fiscal quarter of 2000, a figure consistent with the Board forecast, Razmilovic, Jaeggi and Burke caused Symbol's credit memo reserve account to be increased by only $10.5 million, which allowed Symbol to report the desired revenue figure. This increase was approximately $3.2 million less than the increase that should have been recorded based upon the expected product returns.

60.    Similarly, as part of the Tango process for the first fiscal quarter of 2002, the credit memo reserve was reduced by $2 million in order to, in the words of Jaeggi, make Symbol's revenue number "begin with a three."   Without the improper Tango adjustment, Symbol's reported revenue for the quarter would have been $299.3 million, before extraordinary charges.   Following the bogus Tango adjustment, Symbol's reported revenues were the desired $301.3 million, before extraordinary charges.

**b.    The FICA Deferral**

61.    During the first fiscal quarter of 2000, Symbol paid bonuses to its employees for their work during 1999.   As a result of paying these bonuses, Symbol incurred an obligation in the first fiscal quarter of 2000 to pay $3.5 million in taxes under the Federal Insurance Compensation Act ("FICA").   Under GAAP, Symbol was required to recognize and report this $3.5 million expense in the first fiscal quarter of 2000, the quarter in which the obligation was

incurred.   However, as part of the Tango process, Razmilovic, Jaeggi and Burke caused Symbol to defer the $3.5 million FICA expense to the fourth fiscal quarter of 2000. This fraudulent deferral resulted in Symbol overstating its net earnings for the first fiscal quarter of 2000 by approximately $2.4 million.

### c.   The SERP Reserve

62.     Prior to 2000, various senior executives at Symbol participated in a Senior Executive Retirement Plan ("SERP"), under which Symbol was required to make annual contributions to the executives' retirement plans.   In accordance with GAAP, a reserve was created in Symbol's books to account for the future annual SERP contributions.   Beginning in or about 1999, a number of the senior executives elected, or purported to elect, to swap their SERP benefits for split-life insurance policies funded by Symbol.   As a result of the swaps, Symbol was no longer obligated to fund SERP benefits for those senior executives, leaving millions of dollars in the SERP reserve to be released.   This release would have had the effect of increasing Symbol's net earnings.

63.     Rather than establishing and disclosing a schedule for the release of these reserves as required by GAAP, Symbol utilized the SERP reserve to boost its earnings when its earnings would otherwise fall short of the Board forecasts.   A reserve misused in this manner is sometimes referred to as a "cookie jar" reserve.

64.     For example, during 1999 and 2000, a senior officer at Symbol elected to swap his SERP benefits over a three-year period in exchange for a split-life insurance policy funded by Symbol.   As a result of this swap, Symbol should have established and disclosed a regular schedule to release $4.5 million in the SERP reserves over a three-year period.   Instead, as part of the Tango process, Razmilovic, Jaeggi, Burke and DeGennaro caused Symbol to release

portions of the $4.5 million when needed to adjust the company's raw results to meet Board forecasts. Thus, the $4.5 million was released in the following manner: $1.5 million for the third fiscal quarter of 1999; $1.5 million for the first fiscal quarter of 2000; and $1.5 million for the third fiscal quarter of 2001.

### d. The Reclassification of Expenses

65.     As a result of certain channel stuffing transactions in which VARs and distributors were granted preferential pricing terms, as well as other adverse business conditions, Symbol's gross profit margin on its products was negatively affected. One of the Tango adjustments frequently employed by Razmilovic, Jaeggi, Burke and DeGennaro to conceal the negative impact on Symbol's gross margin was the improper reclassification of expenses from "cost of sales" to "operating expenses." The effect of reclassifying the expenses in this manner was to increase the gross margin that Symbol reported to the public, thereby covering up Symbol's adverse business conditions and channel stuffing transactions.

### G. Manipulation of Non-Recurring Expenses and Cookie Jar Reserves

66.     Razmilovic, Jaeggi, Burke, DeGennaro and DeSantis, with others, caused Symbol falsely to characterize routine operating expenses as non-recurring. The mischaracterization of expenses violated GAAP and allowed Symbol to understate its reported routine operating expenses, which, in turn, allowed Symbol to overstate its financial performance in the eyes of professional stock analysts and the investing public.

67.     Razmilovic, Jaeggi, Burke, DeGennaro and DeSantis, together with others, also caused Symbol to create cookie jar reserves by recognizing and reporting certain non-recurring expenses that far exceeded the expenses that Symbol was likely to incur. These

cookie jar reserves violated GAAP and were created in order to allow Symbol fraudulently to overstate its financial performance in subsequent reporting periods by reversing part or all of the reserves in those periods.

68.     Razmilovic, Jaeggi, Burke and DeGennaro, together with others, frequently utilized these and other cookie jar reserves in the Tango process, when needed, to adjust Symbol's raw results to meet or exceed the Board forecasts.

### a.     Fourth Quarter 2000 - the Telxon Acquisition

69. In the fourth fiscal quarter of 2000, Symbol recognized and reported non-recurring restructuring charges of approximately $185.9 million, purportedly related to Symbol's acquisition of a competitor, Telxon Corporation ("Telxon"), in December 2000.  In a February 27, 2001 press release announcing its fourth quarter 2000 results, Symbol reported that "[n]et income, before non-recurring charges associated with the acquisition of [Telxon] was $23.5 million . . . "

70.     The nonrecurring restructuring charges included at least $80.3 million in expenses that were reported in violation of GAAP, were mischaracterized ordinary expenses, or were overstated in order to create a cookie jar reserve for use in later quarters.

### i.     Inventory Charge

71.     In the fourth fiscal quarter of 2000, as part of the $185.9 million restructuring charge, DeGennaro, together with others, caused Symbol to recognize and report a $63.9 million inventory charge that purportedly arose out of Symbol's decision to eliminate redundant and discontinued products and product lines due to the Telxon acquisition. However, as DeGennaro knew, almost none of the inventory items that made up the $63.9 million charge were discontinued as a result of the Telxon acquisition.

72.    Approximately two-thirds of the $63.9 million inventory charge related to products in inventory that had been discontinued in the ordinary course of business, and thus could not properly be included in restructuring charge.  Approximately one-third of the $63.9 million inventory charge, or $20 million, was a cookie jar reserve derived from inventory items that had never been discontinued.

73.    In the first fiscal quarter of 2001, DeGennaro directed that $5 million of the cookie jar reserve be reversed through a series of accounting entries that had the effect of reducing current period operating expenses and increasing earnings. DeGennaro caused this $5 million accounting adjustment to be concealed from Symbol's outside auditors by directing that two "Inventory Reserve Utilization" schedules be prepared, one that showed the true utilization of the reserve, and another, given to Symbol's auditors, that concealed the $5 million adjustment within a larger charge for scrap inventory.

### ii.    Severance Charge

74.    Also in the fourth fiscal quarter of 2000, as part of the $185.9 million restructuring charge, the defendants Burke, DeGennaro and DeSantis, together with others, caused Symbol to recognize and report approximately $14.1 million in severance and related employee termination expenses that were purportedly related to Symbol's acquisition of Telxon, but were, as the defendants knew, recognized and reported in violation of GAAP.

75.    Under GAAP, an employer could recognize and report severance and termination expenses prior to the period in which the expenses were actually incurred only if the employer committed to a termination plan and informed its employees of the plan in the same financial reporting period in which the charges for those benefits were recognized.  As Burke, DeGennaro and DeSantis knew, by the end of the fourth fiscal quarter of 2000, when Symbol

recognized the $14.1 million in severance and related employee termination expenses, Symbol had not committed to a termination plan and had not communicated any such plan to its employees.

76.     Indeed, in February 2001, after the end of the fourth fiscal quarter of 2000, the defendant Burke, together with others, caused severance letters to be created that were backdated to December 31, 2000, in order to misrepresent that Symbol had complied with the GAAP requirements described above.

77.     In addition, DeGennaro caused $1.8 million of routine inventory expenses relating to excessive and obsolete inventory to be concealed within the $14.1 million severance charge.

### iii.     Asset Impairment Charge

78.     Also in the fourth fiscal quarter of 2000, as part of the $185.9 million restructuring charge, Burke, DeGennaro and DeSantis, together with others, caused Symbol to recognize a $2.3 million asset impairment charge for a Symbol facility located at 110 Wilbur Place in Bohemia, New York, that purportedly was to be vacated in connection with the Telxon acquisition. However, at the time this charge was recognized, Symbol had no plan to vacate the 110 Wilbur Place facility.

### b.     Second Quarter 2001 – The Palms and Radios Write-off

79.     In its quarterly report on Form 10-Q for the second fiscal quarter of 2001, Symbol reported a pre-tax nonrecurring charge of $110 million ($67.1 million after tax) for a write-down of Symbol's "radio frequency infrastructure and systems inventory," that is, inventory related to wireless and mobile computing products known as "Palms and Radios".

80.     In a July 26, 2001 press release announcing its second quarter 2001 results, Symbol reported:

> Net income, before a non-recurring charge, was $7.5 million. . ..Including a nonrecurring charge associated with an inventory write-down of $67.1 million after tax, the net loss for the second quarter was $59.6 million or $0.27 per share.

81.     The $110 million charge was based on the purported lower demand for, and obsolescence, of Palm and Radio products. However, at least $30 million of the charge was unrelated to Palms and Radios, and should not have been recorded as a non-recurring charge. Even though Razmilovic, Jaeggi and DeGennaro knew there was no justification for a write-down for Palms and Radios inventory higher than $80 million, they, together with others, caused the full $110 million reserve to be established.

82.     The excess amount in the Palms and Radio inventory charge was used as a cookie jar reserve to increase Symbol's earnings in later quarters. For example, as part of the Tango process relating to the fourth fiscal quarter of 2001, Razmilovic, Jaeggi and DeGennaro, together with others, caused the reversal of $5 million of the reserve through an accounting entry that became part of a larger adjustment inflating quarterly earnings.

### c.     Third Quarter 2001 -- the Relocation of Manufacturing Facilities

83.     In the third fiscal quarter of 2001, Symbol reported a non-recurring restructuring charge of approximately $59.7 million, purportedly related to Symbol's relocation of manufacturing operations to lower-cost locations in Mexico and the Far East. Symbol disclosed this charge in its Form 10-Q for the quarter ended September 30, 2001, stating that the "restructuring charge, which-was recorded as a component of cost of revenue, includes workforce reduction and asset impairment costs."

84.     In an October 18, 2001 press release announcing its third quarter 2001 results, Symbol reported:

> Net earnings-, before a non-recurring charge, was $12.6 million. . . .
> Additionally, the Company recorded a non-recurring pre-tax charge
> associated with the reorganization of the Company's manufacturing
> facilities of $59.7 million, which resulted in a net loss for the third
> quarter of $35.7 million or $0.16 per share.

This non-recurring charge included at least $21.9 million that was recognized in violation of

GAAP.

85.     In the third fiscal quarter of 2001, as part of the $59.7 million restructuring

charge, Burke and DeGennaro, together with others, caused Symbol to recognize and report an

asset impairment charge of $16.2 million for the disposal of three facilities in Bohemia, New York,

that purportedly was required by the relocation of manufacturing operations.   The charge

consisted of a 75 percent write-down of two leased facilities located at 110 Orville ($9.9 million)

and 1101 Lakeland ($3.7 million), and one Symbol-owned facility located at 116 Wilbur Place

($2.6 million).

86.     This charge violated GAAP because, at the time the charge was recognized,

no disposal plan was established for these facilities, nor had any plans to vacate the facilities been

adopted. In fact, no decision to vacate the two leased facilities was made until late 2001 or early

2002. The third facility - 116 Wilbur Place - was never vacated.

87.     Also in the third fiscal quarter of 2001, as part of the $59.7 million

restructuring charge, DeGennaro, together with others, caused Symbol to recognize and report an

inventory impairment charge of $5.7 million, consisting of $1.2 million in inventory that Symbol

had been holding for a potential sale to the French Post Office that never occurred, and $4.5

million in other inventory held by Symbol for quality control review.

88.     These charges were included in the September 2001 restructuring charge

even though the inventory at issue had been impaired in the ordinary course of Symbol's business,

and was not related to the relocation of manufacturing operations.

89.     Also in the third fiscal quarter of 2001, as part of the $59.7 million restructuring charge, Symbol recognized and reported a severance charge of $11 million purportedly associated with the termination of 375 employees.

90.     Although a Symbol employee calculated the actual severance expense to be approximately $3 million, DeGennaro caused the entire $11 million charge to be included in the September 2001 restructuring charge and instructed the Symbol employee to destroy the documents supporting the $3 million calculation.

### d.     Fraudulent Operations Reserve

91.     DeGennaro, Burke and DeSantis, together with others, also created a fraudulent operations reserve account, known as "Account 9106," that was drawn upon at strategic times to boost quarterly earnings.  On occasions, in fiscal quarters when expenses in Symbol's Operations division were lower than previously forecast, DeGennaro, Burke and DeSantis, together with others, caused Symbol to hide the surplus in Account 9106. In this way, Operations division expense accruals were amassed over time that were drawn upon to offset poor financial performance in other quarters.

92.     For example, as part of the Tango process relating to the fourth fiscal quarter of 2001, Razmilovic, Jaeggi, Burke and DeGennaro, together with others, caused Symbol to release $10 million from Account 9106, which correspondingly reduced Symbol's reported expenses by $10 million.

93.     This release of the Account 9106 cookie jar, combined with the release of $5 million from the Palms and Radios cookie jar described above, and other Tango adjustments, caused Symbol's net income for the fourth fiscal quarter of 2001, after taxes, to change from a net

loss to a net gain and thereby allowed Symbol to meet the Board forecast and Consensus Estimate for that quarter.

### H.   Customer Service Improprieties

94.    The fraudulent overstatement of Symbol's quarterly revenues and earnings extended to Symbol's Customer Service division, which provided maintenance and repair services for Symbol products, as well as other professional support services.   To achieve revenue projections for the Customer Service division, and in violation of GAAP and Symbol's stated revenue recognition policies, Heuschneider, together with others, caused fraudulent accounting entries to be made to the Customer Service accounts in Symbol's general ledger, and caused Symbol to recognize revenue on customer service contracts improperly.

95. Under GAAP, revenue in connection with Customer Service contracts was properly recognized only when the services were rendered, the price was fixed or determinable, and collectibility was reasonably assured.   Furthermore, under GAAP, where Customer Service contracts provided for services to be performed over a period of time, revenue under such contracts was properly recognized and reported ratably, or incrementally, throughout the contract term, and not immediately upon execution.   As Symbol reported in its annual report on Form 10-K for the year 2000, "[s]ervice and maintenance sales are recognized over the contract term."

96.    Thus, under Symbol's revenue recognition procedures, at the time a service contract was executed, the total amount of the contract was booked in a deferred revenue account. As Symbol performed services pursuant to such contracts, Symbol's deferred customer service revenue account was to be debited and its current customer service revenue account was to be credited.

### a.   Unsupported Journal Entries

97.    In violation of GAAP and Symbol's stated rules for recognition of customer service-revenue, Heuschneider, together with others, caused Symbol to overstate its quarterly revenues and earnings by making fraudulent accounting entries that were unsupported, in contravention of GAAP, and designed solely to achieve revenue and earnings forecasts. Heuschneider, together with others, caused the following improper accounting entries to be made to Symbol's general ledger:

a.    For the fourth fiscal quarter of 2001, Heuschneider, together with others, caused a fraudulent accounting entry to be made to Symbol's general ledger that resulted in the improper transfer of $3 million from deferred revenue to current revenue.

b.    For the first fiscal quarter of 2002, Heuschneider, together with others, caused a fraudulent accounting entry to be made to Symbol's general ledger that resulted in the improper transfer of approximately $2.98 million from deferred revenue to current revenue.

c.    For the second fiscal quarter of 2002, Heuschneider, together with others, caused fraudulent accounting entries to be made to Symbol's general ledger that resulted in the improper transfer of approximately $5.5 million from deferred revenue to current revenue.

**b.    Improper Recognition of Customer Service Revenue**

98.    Heuschneider, together with others, also caused Symbol prematurely to recognize and report revenue on specific customer service contracts.

99.    For example, in the fourth fiscal quarter of 2001, Symbol entered into a three-year customer service contract with a customer ("Service Customer #1") for approximately $16 million in which Service Customer #1 prepaid $1.7 million on the contract before year-end. Although the contract called for the services not to commence until May 2002, Heuschneider, together with others, improperly caused Symbol to recognize and report as revenue the $1.7

million that was prepaid in the fourth fiscal quarter of 2001, rather than apportion the contract revenue over the life of the contract starting in May 2002, as was required by GAAP.

100.    Heuschneider, together with others, also caused Symbol to report and recognize revenue on Customer Service contracts that had been canceled or otherwise had expired because they were not renewed by Symbol's customers.

101.    For example, near the end of the second fiscal quarter of 2002, Heuschneider, together with others, caused Symbol to renew several customer service contracts without the customers' knowledge or consent.   By renewing contracts that had previously been terminated by the customer or had expired, Heuschneider, together with others, caused Symbol to recognize and report more than $600,000 in fictitious customer service revenue.

### III.   Connection Between Financial Manipulations and Proceeds from the Offense

#### A.   Proceeds of Razmilovic's Offenses

102.   Razmilovic took advantage of the artificially inflated price of Symbol's stock and made millions of dollars of profits as a result of engaging in improper insider trading and receiving bonuses and a severance payment as a result of Symbol's fraudulently inflated earnings.

103.   In all, Razmilovic reaped over $60,000,000 from the scheme: (a) in excess of $53,000,000 from the exercise of stock options and sale of stock; (b) $2,000,000 in bonuses; and (c) $5,000,000 in severance pay during the Relevant Period.   Razmilovic received these monies while Symbol was trading at inflated prices, based on Symbol's false financials caused by the fraudulent conduct of Razmilovic and others.

#### B.   The Defendant Properties Are Traceable To Razmilovic's Offenses

104.   As a result of the criminal activities described above, specifically, the scheme to manipulate Symbol's reported financial results, Razmilovic generated approximately $60,000,000 in fraud proceeds during the Relevant Period from exercising Symbol stock options and receiving bonuses and severance payment.

105.   Investment account and bank records reveal that the approximately $60,000,000 in proceeds generated from Razmilovic's Symbol stock option exercises and receipt of bonuses and severance payment, were transferred to various accounts held in the names of: (a) Tomo Razmilovic, or (b) Tomo Razmilovic and Ingrid Anna Christina Razmilovic, his wife or (c) Ingrid Anna Christina Razmilovic, and approximately $12,000,000 of the fraud proceeds can be traced to cash and securities identified below.

### a.   Fraud Proceeds Acquired Through Stock Option Exercised on July 27, 1999

106.    On or about February 6, 1995, Symbol granted Razmilovic options to purchase 41,404 shares at an option price per share of approximately $7.7779.

107.    On or about October 16, 1995, Symbol granted Razmilovic options to purchase 202,021 shares at an option price per share of approximately $10.2964.

108.    On July 27, 1999, Razmilovic exercised the above options to buy 243,425 shares, at the specified option per share prices, for a total price of approximately $2,080,089.00. Razmilovic reported a taxable gain of $7,639,166.00 on the exercise of the options.

109.    Instead of paying Symbol the $2,080,089.00 price in cash for the above 243,425 shares, Razmilovic sold 144,116 of the shares back to Symbol at the then $41.25 market price per share, and Symbol paid Razmilovic the total price of $5,944,785.00.

110.    At all times relevant, Razmilovic knew that the $41.25 market price per share, at which he sold 144,116 of the shares to Symbol, was not the true fair market value of the shares, but was a price artificially inflated by the false statements and fraudulent conduct of Razmilovic and others, as set forth above.

111.    Razmilovic used the $5,944,785.00 proceeds of the sale of 144,116 shares to Symbol to: (1) pay the cost of exercising his option to acquire the remaining 99,309 option shares; and, (2) pay taxes on his reported taxable gain of $7,639,166.00.

112.    Razmilovic obtained ownership of the 99,309 shares with proceeds realized as a result of his fraudulent statements and conduct. Had Razmilovic sold the 144,116 of the shares to Symbol at their true market value, he would not have realized proceeds sufficient to pay for the remaining 99,309 option shares or to pay taxes on his reported taxable gain of

$7,639,166.00.

113.    Razmilovic deposited the 99,309 shares in Bank of America Securities Account #207-00242, held in the name of Tomo Razmilovic (the "242 Account").

114.    On July 30, 1999, Razmilovic and Bank of America ("BOA") entered into a written agreement with respect to the above 99,309 shares, whereby, among other things: (1) BOA was allowed to buy, and Razmilovic was obligated to sell, if on the August 2, 2002 expiration date of the agreement, the stock price of the subject shares was higher than the specified call strike price and (2) BOA was obligated to buy the subject shares if on the expiration date, the stock price was lower than the specified high put strike price.

115.    On April 11, 2000, a stock split resulted in an additional 49,654 shares of Symbol, resulting in a total of 148,963 shares held in the 242 Account.

116.    On May 1, 2000, Razmilovic exercised an option for 100,000 shares of Symbol. These shares were held in the 242 Account.

117.    On June 19, 2000, Razmilovic transferred 100,000 shares from the 242 Account to Bank of America Securities Account #207-00720, held in the name of Tomo and Anna Razmilovic (the "720 Account"), leaving a balance of 148,963 shares in the 242 Account.

118.     On April 20, 2001, a stock split resulted in an additional 74,481 shares, which were deposited into the 242 Account which then held a total of 223,444 shares.

119.     By a Notice of Option Strike Adjustments dated September 18, 2001, entered into as a result of, inter alia, stock splits, BOA and Razmilovic adjusted: the number of shares subject to the July 30, 1999 agreement to the above 223,445 shares and the call strike price and the high put strike.

120.     On August 6, 2002, because the market price of the subject shares was less than the adjusted high put strike price, BOA paid Razmilovic $3,156,376.39 to purchase the 223,445 shares.

121.     The proceeds of the sale were wired into Bank of America Securities Account # 510-02777, held in the name of Tomo Razmilovic (the "2777 Account").

122.     On January 2, 2003, $1,000,000 of the proceeds of the sale of the 223,444 shares to BOA were wired from the 2777 Account to Credit Suisse Account #313316-12, held in the name of Tomo Razmilovic and/or Ingrid Anna-Christina Razmilovic.

### b.     Fraud Proceeds Acquired Through Option Exercised on May 2, 2001

123.     On or about February 12, 1996, Symbol granted Razmilovic options to purchase 173,920 shares at an option price per share of approximately $4.9383.

124.     On or about October 21, 1996, Symbol granted Razmilovic options to purchase 290,495 shares at an option price per share of approximately $5.8931.

125.     On May 2, 2001, Razmilovic exercised the above options to buy to buy 464,415 shares, at the specified option per share prices, at a total price of approximately

$2,570,769.23. Razmilovic reported a taxable gain of $10,483,905.60 on the exercise of the options.

126.    Instead of paying Symbol the  $2,570,769.23 price in cash for the above 464,415 shares, Razmilovic sold 264,415 of the shares back to Symbol at the then $28.11 market price per share, and Symbol paid Razmilovic the total price of $7,432,705.65.

127.    At all times relevant, Razmilovic knew that the $28.11 market price per share, at which he sold 264,415 of the shares to Symbol, was not the true fair market value of the shares, but was a price artificially inflated by the false statements and fraudulent conduct of Razmilovic and others, as set forth above.

128.    Razmilovic used the $7,432,705.65 proceeds of the sale of 264,415 shares to Symbol to: (1) pay the cost of exercising his option to acquire the remaining 200,000 shares; and, (2) pay taxes on his reported taxable gain of $10,483,905.60.

129.    Razmilovic obtained ownership of the 200,000 shares with proceeds realized as a result of his fraudulent statements and conduct.  Had Razmilovic sold the 264,415 of the shares to Symbol at their true market value, he would not have realized proceeds sufficient to pay for the remaining 200,000 option shares or to pay taxes on his reported taxable gain of $10,483,905.60.

130.    The 200,000 shares were deposited in the 720 Account.

131.    On May 14, 2001, Razmilovic and BOA entered into a written agreement with respect to the above 200,000 shares, whereby, among other things: (1) BOA was allowed to buy, and Razmilovic was obligated to sell, if on the May 14, 2003 expiration date of the agreement, the stock price was higher than the specified call strike price and (2) BOA was

obligated to buy those shares if on the expiration date, the stock price was lower than the specified high put strike price.

132.   On May 14, 2003, the market price of the subject shares was less than the adjusted high put strike price and, on May 16, 2003, BOA paid Razmilovic $3,782,240 to purchase the shares.

133.   On or about May 16, 2003, the $3,782,240 proceeds of the sale were wired to Credit Suisse Account #0842-326324-32, held in the name of Ingrid Anna-Christina Razmilovic.

### c.   Fraud Proceeds Acquired Through Option Exercised on February 1, 2002

134.   On or about October 21, 1996, Symbol granted Razmilovic options to purchase 165,130 shares at an option price per share of approximately $5.8931.

135.   On or about February 10, 1997, Symbol granted Razmilovic options to purchase 364,500 shares at an option price per share of approximately $6.9136.

136.   On or about February 10, 1997, Symbol granted Razmilovic options to purchase 455,625 shares at an option price per share of approximately $6.5185.

137.   On or about January 5, 1998, Symbol granted Razmilovic options to purchase 654,170 shares at an option price per share of approximately $7.3704.

138.   On February 1, 2002, Razmilovic exercised the above options to buy 1,744,630 shares, at the specified option per share prices, for a total price of approximately $12,008,811.69.  Razmilovic reported a taxable gain of $14,388,569.00 on the exercise of the options.

139.    Instead of paying Symbol the $2,080,089.00 price in cash for the above 1,744,630 shares, Razmilovic sold 1,064,798 of the shares back to Symbol at the then $15.16 market price per share, and Symbol paid Razmilovic the total price of $16,142,337.68.

140.    At all times relevant, Razmilovic knew that the $15.16 market price per share, at which he sold 1,064,798 of the shares to Symbol, was not the true fair market value of the shares, but was a price artificially inflated by the false statements and fraudulent conduct of Razmilovic and others, as set forth above.

141.    Razmilovic used the $16,142,337.68 proceeds of the sale of 1,064,798 shares to Symbol to: (1) pay the cost of exercising his option to acquire the remaining 679,832 shares; and, (2) pay taxes on his reported taxable gain of $14,388,569.00.

142.    Razmilovic obtained ownership of the 679,832 shares with proceeds realized as a result of his fraudulent statements and conduct.   Had Razmilovic sold the 1,064,798 shares to Symbol at their true market value, he would not have realized proceeds sufficient to pay for the remaining 679,832 option shares or to pay taxes on his reported taxable gain of $14,388,569.00.

143.    The subject shares were deposited in the 2777 Account.

144.    The shares were held together with 96,069 other shares, resulting in a total of 756,549 shares in the 2777 Account as of February 21, 2002.

145.    On March 6, 2002, Razmilovic sold, on the open market, 25,000 shares for $222,061.64 and the remaining 731,549 shares for $6,420,562.18, leaving a balance in the 2777 Account of $6,642,623.82, of which $5,799,014.40 was from the sale of the subject shares.

146.    On April 5, 2002, $3,724,570.24 from the proceeds of the sale of the subject

shares was wired from the 2777 Account to Credit Suisse Account #313316-12, held in the name of Tomo Razmilovic and/or Ingrid Anna-Christina Razmilovic.

### d.    Fraud Proceeds From February 2001 Grant of Options

147.    In February 2001, in connection with a periodic review of Razmilovic's performance, Symbol granted Razmilovic options to purchase 375,000 shares of stock at a price of $27.97.

148.    The stock options Symbol awarded to Razmilovic based on a review of his performance in February 2001 were proceeds of Razmilovic's fraudulent statements and conduct, as set forth above, which had artificially inflated the value of Symbol shares and resulted in the award of options to Razmilovic based on a review of his performance.

149.    On February 14, 2002, Razmilovic resigned as president and CEO of Symbol, and entered into a Separation, Release and Non–Disclosure Agreement ("Separation Agreement"), dated February 14, 2002.

150.    Under the Separation Agreement, Razmilovic received a severance payment of $5,000,000 in exchange for relinquishing his right to all outstanding stock options granted as a result of the February 2001 performance review.

151.    The $5,000,000 severance payment constitutes proceeds derived from Razmilovic's ownership of the stock options awarded to him in February 2001 and relinquished by him in February 2002.

152.    On March 25, 2002, $3,210,000 of the $5,000,000  severance payment from Symbol was deposited into J.P. Morgan Chase Account #400-637125, held in the name of

Tomo Razmilovic and Ingrid Anna Christina Razmilovic.

153.    On April 5, 2002, $3,000,000 from Razmilovic's severance payment was wired from J.P. Morgan Chase Account #400-637125, held in the name of Tomo Razmilovic and Ingrid Anna Christina Razmilovic to Credit Suisse Account # 313316-12, held in the name of Tomo Razmilovic and/or Ingrid Anna-Christina Razmilovic.

### e.    Transfer of Fraud Proceeds into the Defendant Account, And Sub-Accounts

154.    On March 20, 2003, $1,464,000, which included the $1,000,000 fraud proceeds from the sale of the 223,444 shares obtained through the option exercised on July 27, 1999, was transferred from Credit Suisse Account #313316-12, held in the name of Tomo Razmilovic and/or Ingrid Anna-Christina Razmilovic, to Credit Suisse Account #326324-32, held in the name of Anna Christina Razmilovic.

155.    On March 27, 2003, $1,350,000, which included the $1,000,000 fraud proceeds of the sale of the 223,444 shares obtained through the option exercised on July 27, 1999, was transferred from Credit Suisse Account # 326324-32, held in the name of Anna Christina Razmilovic, to Credit Suisse Account #326324-32-4, held in the name of Ingrid Anna Christina Razmilovic.

156.    On April 1, 2003, $7,883,028.32 was transferred from Credit Suisse Account # 313316-12, held in the name of Tomo Razmilovic and Ingrid Christina Anna Razmilovic, to Credit Suisse Account #326324-32, held in the name of Ingrid Christina Anna Razmilovic.

157.    The April 1, 2003 transfer of $7,883,028.32 included: (1) $3,000,000 of

fraud proceeds from Razmilovic's severance pay; (2) $3,724,570.24 of fraud proceeds from Razmilovic's exercise of the stock option on February 1, 2002; and (3) $1,000,000 of fraud proceeds from the exercise of Razmilovic's stock option on July 27, 1999.

158.    On September 30, 2004, $10,400,000 was transferred from Credit Suisse Account # 326324-32, held in the name of Ingrid Christina Anna Razmilovic, to Credit Suisse Account #326324-32-8, held in the name of Ingrid Christina Anna Razmilovic, and then to Credit Suisse Account #326324-32-4-35 and a fiduciary call deposit, held in the name of Ingrid Christina Anna Razmilovic, and then to Credit Suisse Account #326324-3, held in the name of Ingrid Christina Anna Razmilovic.

159.    The September 30, 2004 transfer of $10,400,000.00 to Account 326324-3 included: (1) $3,000,000 of fraud proceeds from Razmilovic's severance pay; (2) $3,724,570.24 of fraud proceeds from Razmilovic's exercise of the stock option on February 1, 2002; and (3) $1,000,000 of fraud proceeds from Razmilovic's exercise of the stock option on July 27, 1999.

## IV.    The Indictment and Subsequent Relevant Events

160.    On May 28, 2004, Razmilovic, together with Jaeggi, Burke, DeGennaro, Borghese, Goldner, DeSantis and Heuschneider, were charged in an Indictment filed in the Eastern District of New York, alleging that they engaged in widespread fraudulent practices in the reporting of Symbol's revenues and expenses with the design to artificially inflate Symbol's earnings and the value of its stock.  (A copy of the Indictment is annexed as exhibit A and incorporated herein in its entirety).

161.    In early June 2004, shortly after the Indictment issued, Razmilovic, together with Ingrid Anna Christina Razmilovic, left his apartment in London and stayed in a hotel in

Opatija, Croatia from June 9 through 11, 2004.   Upon learning that both United States and British authorities sought to arrest him, Razmilovic fled to Sweden.

162.    Razmilovic has been a citizen of Sweden since 1971.   Ingrid Anna Christina Razmilovic is a Swedish national.

163.    Razmilovic has not returned, and has refused to return, to the United States.

164.    United States law enforcement authorities have requested Swedish authorities to extradite Razmilovic for trial on the above-mentioned criminal charges in the Indictment, but Sweden has refused to do so.

165.    The transfers and attempted transfers described in detail above, at ¶¶ 106-159, constitute financial transactions and transfers of monetary instruments or funds that were designed to conceal the tainted funds from U.S. authorities and frustrate efforts to restrain those funds.

166.    Specifically, Razmilovic and his nominees did knowingly and intentionally: (a) conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, which in fact involved the proceeds of specified unlawful activity, to wit: mail, wire, and securities fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (b) transport, transmit and transfer monetary instruments and funds, and attempt to do so, from a place in the United States, to wit, New York, New York, to and through a place outside the United States, to wit Switzerland, knowing that the monetary instruments and funds involved in the transportation,

transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, to wit: mail, wire and securities fraud, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

167.    Additionally, each of these transfers was in an amount greater than $10,000. Specifically, Razmilovic and his nominees did knowingly and intentionally engage and attempt to engage in monetary transactions, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: mail, wire, and securities fraud, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1957(a).

## FIRST CLAIM FOR RELIEF

168.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 167 above.

169.    The Defendant Properties represent property constituting or derived from proceeds traceable to offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, securities fraud, mail fraud and wire fraud, 15 U.S.C. §§ 78j(b) and 78ff, 18 U.S.C. §§ 1341 and 1343, or a conspiracy to commit such offenses.

170.    As a result of the foregoing, the Defendant Properties, and all proceeds traceable thereto, are liable to condemnation and forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

171.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 167 above.

172.   The Defendant Properties were involved in transactions and attempted transactions that: (a) were designed to conceal or disguise the nature, location and source of the proceeds generated by the securities, mail and wire fraud scheme; and/or (b) transmitted funds or monetary instruments, which represent the proceeds of some form of unlawful activity, from a place in the United States to or through a place outside the United States, in order to conceal or disguise the nature, location, and source of the proceeds of a specified unlawful activity, to wit, mail, wire, and securities fraud and conspiracy to commit mail, wire and securities fraud, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

173.   As a result of the foregoing, the Defendant Properties and all proceeds traceable thereto are liable to condemnation and forfeiture to the United States in accordance with 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

174.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 167 above.

175.   The Defendant Properties were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957.

176.   The Defendant Properties are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the plaintiff requests that a warrant of this Court be issued for the

arrest of the proceeds traceable to the Defendant Properties; that due notice of these proceedings be given to all interested persons; that the Defendant Properties be forfeited and condemned to use of the United States of America; that the plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated:   Central Islip, New York
         December 17, 2013

                     LORETTA E. LYNCH
                     United States Attorney
                     Eastern District of New York
                     610 Federal Plaza, 5th Fl.
                     Central Islip, New York 11722

By:    */s/ Vincent Lipari*
                     VINCENT LIPARI
                     Assistant U.S. Attorney
                     (631) 715-7864

47

# V E R I F I C A T I O N

I, HOPE M. CERDA, hereby verify as follows:

1.      I am a Postal Inspector with the U.S. Postal Inspection Service.

2.      I have read the foregoing complaint and know the contents thereof.

3.      The matters contained in the complaint are based upon my own knowledge or based on information and belief.  The sources of information and the grounds of my belief are the official files and records of the U.S. Postal Inspection Service and other federal agencies.

4.      I verify under penalty of perjury that the foregoing is true and correct.

Dated: Central Islip, New York
        December  1 7, 2013

HOPE M. CERDA
U.S. POSTAL INSPECTION SERVICE